# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3966 | **DATE** | 3/20/2002 |
| **CASE TITLE** | MACARIA ADAN vs. SOLO CUP, INC., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion for summary judgment [25-1] is granted as to Count IV and V and denied as to Counts I and II. Judgment is entered for defendants Ronald Udchitz and Antonio Gonzalez and against plaintiff Macaria Adan on Counts IV and V. The joint final pretrial order and agreed pattern jury instructions shall be presented on April 18, 2002 at 9:00 a.m. Plaintiff's draft shall be submitted to defendants by April 10, 2002. Trial is set on April 29, 2002 at 9:00 a.m. ENTER MEMORANDUM OPINION AND ORDER.

*/s/ Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 21 2002 date docketed | |
| | Docketing to mail notices. | | | 35 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | 3/20/2002 | |
| | | | date mailed notice | |
| CB | courtroom deputy's initials | 02 MAR 19 PM 1:14 | CB | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MACARIA ADAN )
)
Plaintiff, ) No. 01 C 3966
)
v. ) Suzanne B. Conlon, Judge
)
SOLO CUP, INC., et al. )
) DOCKETED
Defendants. )
MAR 2 1 2002

## MEMORANDUM OPINION AND ORDER

Macaria Adan ("Adan") sues her former employer, Solo Cup, Inc. ("Solo"), and her former co-workers, Juan Villanueva ("Villanueva"), Ronald Udchitz ("Udchitz") and Antonio Gonzalez ("Gonzalez")(collectively, "individual defendants"). Specifically, Adan alleges a sexual harassment claim in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I) against Solo, common law claims for intentional infliction of emotional distress against Villanueva (Count II), Udchitz (Count IV) and Gonzalez (Count V) and a common law claim for assault against Villanueva (Count III). Solo and the individual defendants (collectively, "defendants") move for summary judgment on Counts I, II, IV and V pursuant to Federal Rule of Civil Procedure 56.

## BACKGROUND

I. **Local Rule 56.1**

Local Rule 56.1 requires litigants to follow a detailed procedure in filing and responding to summary judgment motions. Local Rule 56.1 requires the moving party to submit a statement of

1



material facts "as to which the moving party contends *there is no genuine issue* and that entitle the moving party to a judgment as a matter of law." Local Rule 56.1(a)(3)(emphasis added). Defendants' statement of material facts ("Def. Facts") does not comply with this procedure.

In their statement of facts, defendants present Adan's version of the facts in one paragraph and then deny the same facts based on the testimony of defendants' witnesses in another paragraph. *See* Def. Facts ¶ 33-34 denied in ¶ 36; ¶¶ 37-38 denied in ¶ 40; ¶ 48 denied in ¶¶ 51-53; ¶ 54 denied in ¶¶ 58 and 139; ¶¶ 66-67 denied in ¶¶ 56 and 84; ¶¶ 68-69 denied in ¶¶ 56, 71 and 108; ¶¶ 78-80 denied in ¶¶ 56, 81-84, 88 and 108; ¶ 85 denied in ¶¶ 56 and 98; ¶ 86 denied in ¶¶ 56 and 108; ¶¶ 105-106 denied in ¶¶ 56 and 107-111; ¶ 135 denied in ¶ 145; ¶ 137 denied in ¶ 142; and ¶ 138 denied in ¶ 139. Defendants also attempt to rebut Adan's version of the facts by improperly challenging her credibility. *See* Def. Facts ¶ 12, based on ¶¶ 7-11; ¶ 16, based on ¶¶ 13-15, and ¶¶ 17-19, 21-22, 35, 40, 49-50, 55, 57, 70, 87, 149 and 170-171. Although Adan's testimony on certain subjects may be questionable, the court cannot resolve issues of credibility on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Therefore, the court reviews all facts, including the facts disputed by defendants, in the light most favorable to Adan. *See Id.*

**II.  Facts**

On March 29, 1998, Solo hired Adan as a machine operator to work at its 96th Street facility in Chicago, Illinois. Adan worked the first shift until the conclusion of her six week training period. Thereafter, Adan worked the third shift. At that time, Adan reported to shift supervisors Debbie Walker and Ed Scuch. Beginning in January 1999, Walker and Scuch reported to production supervisor George Comlosan.

Approximately 110 employees work the third shift. Throughout Adan's employment, Udchitz and Gonzalez worked the third shift as maintenance mechanics. Villanueva also worked the third shift as a machine operator until he voluntarily terminated his employment on May 1, 2000.

Sometime between October 1998 and January 1999, Adan noticed that Udchitz and Gonzalez would not clean up after fixing her machine. When Adan confronted Udchitz with the problem, Udchitz asked Adan, "Why should I clean them for you, fucking [bitch]?" Adan informed Udchitz if he called her a fucking bitch again, she would "go right now to the office." Udchitz responded by saying, "Okay, go, fucking bitch. They're not going to pay any attention to you. They're not even going to listen to you and they're not going to do anything to me."

Adan told Walker about Udchitz's conduct. Pursuant to Walker's instructions, Adan reported Udchitz to Comlosan. Comlosan told Adan that he would talk to Udchitz. Comlosan also told Adan, "please feel free to come and talk to me in the office right away, as soon as these things happen."

Thereafter, Adan had problems with Villanueva and Gonzalez as well as Udchitz. In the upstairs cafeteria, Villanueva threw paper cups at Adan and other employees. The individual defendants also threw paper cups at each other. Sometimes, Gonzalez passed gas as he walked by Adan.

Villanueva asked Adan to "come and suck it for me" while Gonzalez and Udchitz laughed. When Adan walked out of the cafeteria, she heard Gonzalez and Udchitz say, "The bitch is leaving. She didn't like her break" or "Oh, look at the bitch. She doesn't like what we're saying."

Villanueva often followed Adan to the staircase leading to the cafeteria. The first time Villanueva followed her, he pushed her forward. The second time, Villanueva tried to massage Adan

3

from behind. On another occasion, Villanueva told Adan, "I know you want me. I know you want me, and one day I'm going to have you."

As they passed in the stairway leading to the cafeteria, Villanueva often tried to squeeze Adan into the wall. Adan then pushed Villanueva away with her arm and shoulder. Other times, Villanueva pushed Adan from behind and touched her buttocks with his body. Villanueva also tried to rub Adan's breasts. On one occasion, he was successful. When this conduct occurred, Adan pushed Villanueva away, telling him not to touch her and to get out of her sight. Villanueva would respond by saying, "I'm not going to do something to you, but I have people who can do something to you."

Adan observed Villanueva touching other employees, including Leticia Ochoa and Gonzalez. Adan saw Villanueva touch Ochoa's face and breasts. Adan claims Villanueva touched Gonzalez's buttocks and "in front" while Gonzalez was fixing her machine in an effort to get her attention.

Adan encountered Gonzalez on the stairway leading to the cafeteria. A few times, Gonzalez pushed Adan to the side so he could get by her. Udchitz never touched Adan.

Sometime between May and October 1999, Adan complained to Comlosan about "the same problem." Adan did not approach Comlosan earlier because he promised her that he would take care of the problem. Adan and Comlosan then met with personnel manager Tom Domasica. During the meeting, Adan told Domasica about the issues she had with the individual defendants "from the beginning." Adan complained that Villanueva whistled as he walked by Adan on the plant floor. When Adan looked, Villanueva would be fixing his shirt with the fly to his pants open.

In January 2000, Adan once again complained to Comlosan and Domasica about the individual defendants, telling them "exactly the same thing that was happening, everything that was

4

happening." Adan specifically told Comlosan and Domasica that the activity in the cafeteria and on the stairway had increased with Villanueva "touching [her] even more on purpose to make fun of [her]." Domasica told Adan he would take care of the problem.

On January 14, 2000, Comlosan counseled the individual defendants about their conduct. Comlosan also instructed the shift supervisors to ensure the individual defendants took their breaks at a different time than Adan.

Nevertheless, Udchitz continued to call Adan a "fucking bitch." Udchitz would say, "I'm done with this bitch" when he finished working on Adan's machine. In the cafeteria, Villanueva touched Adan on the back. The individual defendants then laughed "as if it was a big joke that he would touch me . . . and I was not looking." Gonzalez would say, "Oh, she didn't like the way you touched her." Villanueva told Udchitz, behind Adan's back, "Oh, come here and suck it for me." The individual defendants also threw paper towels at each other over Adan and passed gas more frequently.

At the end of January, Adan once again complained to Comlosan and Domasica about the individual defendants' conduct. Domasica assured Adan that the conduct would stop.

Around April 7, 2000, Adan complained to Comlosan that the conduct in the cafeteria had not improved. Comlosan told Adan that he could arrange a meeting with Domasica. Adan expressed reluctance about the meeting because she was afraid that Villanueva would find out if she spoke with Domasica. Adan ultimately agreed to meet with Domasica.

At the meeting, Adan once again told Domasica and Comlosan about everything that had happened. Specifically, Adan told Domasica and Comlosan about the things Villanueva had said to her and that "now [Villanueva] was touching his parts and telling me that he had something for

5

me and they were laughing and laughing . . . " Domasica told Adan that he would take care of the situation.

On April 8, 2000, Domasica met with Villanueva and Gonzalez in his office. Domasica read and explained Solo's harassment policy. Domasica warned Villanueva and Gonzalez that any future conduct would result in disciplinary action, including termination. When Domasica attempted to meet with Udchitz, he was advised Udchitz had already left for the day. Domasica instructed Udchitz's supervisor to meet with Udchitz.

Approximately three to four hours later, Villanueva followed Adan to the cafeteria. Villanueva was laughing when he asked Adan, "what happened?" Adan immediately went to Comloson crying. Adan told Comlosan she was afraid to go home because Villanueva previously threatened her. Comlosan escorted Adan to the parking lot at the end of her shift.

On April 9, 2000, Comlosan told Villanueva to stay away from Adan. Comloson then told Adan of his instructions to Villanueva. Comlosan once again escorted Adan to the parking lot at the end of her shift.

On April 10, 2000, Adan called in sick. The next day, Adan saw a doctor who referred her to a psychiatrist. Pursuant to her psychiatrist's instructions, Adan took a leave of absence until June 2000.

In June 2000, Adan's psychiatrist released her to return to work part-time. Adan asked Domasica for part-time work on the first or second shift. Domasica responded that a part-time position on those shifts was unavailable. Domasica then told Adan that the people who had been bothering her were no longer working at Solo. Adan agreed to work three hours on the third shift three days per week. When Adan reported to work, she immediately saw Udchitz and Gonzalez.

6

Adan worked two days before terminating her employment. Domasica offered Adan duties on the first and second shift, but Adan declined to return to work.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The summary judgment standard is applied with special scrutiny to employment discrimination cases because the outcome may depend on determinations of credibility and intent. *Michas v. Health Cost Controls of Illinois*, 209 F.3d 687, 692 (7th Cir. 2000).

### II. Hostile Environment Sexual Harassment

Title VII prohibits an employer from discharging or otherwise discriminating against an employee in the terms, conditions or privileges of employment based on the employee's sex. 42 U.S.C. § 2000e-2(a). Title VII's prohibition against sex discrimination protects employees against sexual harassment. 42 U.S.C. § 2000e-2(a)(1); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). In order to establish a *prima facie* case of sexual harassment based on a hostile work environment, Adan must show: (1) she was subjected to unwelcome sexual harassment in the form

of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile or offensive work environment that seriously affected her psychological well-being; and (4) a basis for employer liability. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). Solo claims summary judgment is appropriate because Adan cannot prove the second, third and fourth elements of a *prima facie* case.

A.  **Harassment Based on Sex**

Solo first contends that Adan cannot establish she was harassed because of her sex. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimination because of sex.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). "The critical issue, as Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.*

Adan has presented sufficient evidence that the individual defendants subjected her to conduct not directed at male employees. When unwelcome conduct is explicitly sexual, it is reasonable to infer the conduct would not have been directed at someone of the same sex. *Oncale*, 523 U.S. at 80. Villanueva's comments of "come and suck it for me," "I know you want me and one day I'm going to have you," and "I have something for you" while touching himself are explicitly sexual. Villanueva's attempts to touch Adan's breasts also are explicitly sexual. Therefore, a reasonable jury could conclude that Villanueva's treatment of Adan was based on her sex.

8

Contrary to Solo's position, Adan's observation of Villanueva touching Gonzalez on the buttocks and "in front" does not change this analysis. Solo does not offer any evidence rebutting Adan's claim that Villanueva's conduct toward Gonzalez was horseplay designed to get her attention. *See Oncale*, 523 U.S. at 81-82.

Whether the non-sexual conduct, including the repeated use of the word "bitch," can reasonably be construed as gender-based is a much closer question. Non-sexual conduct may be actionable where the "incidents are unmatched by similar reports of verbally and physically aggressive behavior toward male co-workers. This evidence would permit a trier of fact to draw the inference that [the harasser] chooses to harass women but not men." *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). With the exception of the individual defendants throwing cups at each other and other employees, there is no evidence that other males in the workplace were subjected to the same type of conduct directed toward Adan. Therefore, a reasonably jury could infer the non-sexual conduct, which was interspersed with the sexual conduct, was based on Adan's sex.

**B.     Severe or Pervasive**

Solo next contends Adan cannot establish that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67. Whether harassment is sufficient severe or pervasive depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). The work environment cannot be described as hostile for purposes of Title VII unless a

reasonable person would find it offensive and Adan actually perceived it as hostile. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000).

The record supports an inference that Adan perceived her work environment as hostile as a result of the harassment. When Adan encountered Villanueva on the stairway leading to the cafeteria, she pushed him away, telling him not to touch her and to get out of her sight. According to Adan, she complained about the individual defendants' conduct to two different members of management on five separate occasions over a 15 to 17 month period. Pursuant to her psychiatrist's instructions, Adan thereafter took a leave of absence from April through June 2000. Adan's actions demonstrate her concern over the individual defendants' conduct and an unwillingness to tolerate further harassment.

Whether Adan's work environment objectively could be described as hostile "should be judged from the perspective of a reasonable person in [Adan's] position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81. There is no "magic number" of incidents required to establish a hostile environment. *Hostetler*, 218 F.3d at 807. Even one act of harassment will suffice if egregious. *Id.* Indeed, "harassment need not be both severe *and* pervasive to impose liability; one or the other will do." *Id.* Conduct involving touching increases the severity of the situation. *Id.*

Adan claims that Villanueva touched her on several occasions, including touching her breast on one occasion. Direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment. *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001). Indeed,

> [d]rawing the line [between vulgar behavior and sexually harassing behavior] is not always easy. On one side lie sexual assaults; *other physical contact, whether amorous or hostile, for which there is no consent express or implied*; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. We spoke [previously] of "the

10

line that separates the merely vulgar and mildly offensive from the deeply offensive
and sexually harassing." It is not a bright line, obviously, this line between a merely
unpleasant working environment on the one hand and a hostile or deeply repugnant
one on the other.

*Id.* at 267, *quoting Baskerville v. Culligan International Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995).

Adan's complaints about the individual defendants throwing cups and towels, passing gas, teasing her when she left the cafeteria and calling her names, without more, may fall on the side of vulgar behavior. However, these incidents combined with Villanueva's sexual comments and conduct, which prompted laughter by Udchitz and Gonzalez, may move the conduct to the actionable side of the line dividing vulgar behavior from abusive conduct, especially when Villanueva threatened Adan with harm. Based on the totality of the circumstances, a reasonable jury could find the conduct sexually harassing.

C. **Basis for Employer Liability**

In a case of co-worker harassment, an employer is liable only if it knew or should have known of the harassment and failed to take appropriate remedial action. *Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1018 (7th Cir. 1996). Reasonableness hinges on the seriousness of the harassment alleged. *Baskerville*, 50 F.3d at 432.

Adan claims she first complained to Comlosan sometime between November 1998 and January 1999. At that time, Comloson told Adan he would take care of the problem. Thereafter, Adan claims the conduct continued and she complained to Comlosan and Domasica sometime between May 1999 and October 1999. Adan complained a third and fourth time to Comlosan and Domasica about the same conduct on two separate occasions in January 2000. In January 2000, Comlosan held counseling sessions with the individual defendants. When the conduct did not stop, Adan complained for a fifth time in April 2000. Domasica then held counseling sessions with

11

Villanueva and Gonzalez, and ordered Udchitz's supervisor to counsel him. Crediting Adan's version of events, a material issue of fact exists whether Solo failed to take appropriate remedial measures in response to Adan's continued complaints.

### III.    Intentional Infliction of Emotional Distress

The individual defendants move for summary judgment on Adan's claims of intentional infliction of emotional distress. To establish a *prima facie* case of intentional infliction of emotional distress, Adan must prove: (1) the individual defendants engaged in extreme and outrageous conduct; (2) the individual defendants knew or should have know their conduct would cause severe emotional distress; and (3) the conduct caused Adan severe emotional distress. *McGrath v. Fahey*, 126 Ill.2d 78, 86, 533 N.E.2d 806, 809 (1998). The individual defendants argue that Adan cannot prove their conduct was extreme and outrageous.

In order to establish extreme and outrageous conduct, Adan must prove more than "mere insult, indignities, threats, annoyances, petty oppression or trivialities." *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89, 360 N.E.2d 765, 767 (1997). "Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 21, 607 N.E.2d 201, 211 (1992). The determination of whether a defendant's conduct is extreme and outrageous must be made on the facts of each particular case. *McGrath*, 126 Ill. 2d at 90, 533 N.E. 2d at 811.

Construing all inferences in her favor, Adan has not established that the conduct of Udchitz and Gonzalez was extreme and outrageous. Adan complains that Udchitz and Gonzalez threw cups and towels, passed gas, teased her, laughed at her and called her names. Adan concedes that Udchitz never touched her and Gonzalez pushed her to get by her on the stairs. The conduct of Udchitz and

Gonzalez, although rude and inappropriate, cannot reasonably be considered extreme and outrageous. *See Piech v. Arthur Andersen & Co., S.C.*, 841 F. Supp. 825, 831 (N.D.Ill. 1994)("The work setting contemplates a degree of teasing and taunting that in other circumstances might be considered cruel and outrageous").

A reasonable jury could determine Villanueva's conduct was extreme and outrageous. Contrary to Villanueva's contention, Villanueva's alleged conduct is not "garden-variety" sexual harassment. According to Adan, Villanueva frequently subjected Adan to both verbal and physical sexual conduct over a significant period of time. Moreover, Villanueva threatened Adan during this time period by telling her, "I have people who can do something to you." A veiled or explicit threat is "a substantial factor in evaluating the outrageousness of [the defendant's] conduct" where the plaintiff reasonably believes the threat will be carried out. *McGrath*, 126 Ill.2d at 88, 533 N.E.2d at 810. Not only did Adan believe Villanueva would carry out his threat, Comlosan also demonstrated his concern by walking Adan to the parking lot after learning of the threat. Under these circumstances, a reasonable jury could conclude that Villanueva's conduct was extreme and outrageous.

Villanueva argues Adan's intentional infliction of emotional distress claim is preempted by the Illinois Human Rights Act. The court already considered and rejected this argument in deciding the individual defendants' motion to dismiss. The court has subject matter jurisdiction over Adan's intentional infliction of emotional distress claim against Villanueva.

## CONCLUSION

Udchitz and Gonzalez are entitled to judgment as a matter of law on Counts IV and V. The motion for summary judgment as to Count I against Solo and Count II against Villanueva is denied.

March 20, 2002

ENTER:

Suzanne B. Conlon
United States District Judge